ROBERT A. KINGSLAND, an Infant, by FREDERICK G. KINGSLAND, His Guardian ad Litem, et al., Respondents, v. ERIE COUNTY AGRICULTURAL SOCIETY, Appellant and Respondent, and INTERNATIONAL FIREWORKS COMPANY, Appellant.

Argued October 18, 1948; decided January 13, 1949.

*Frank Gibbons* and *Willard M. Pottle* for International Fireworks Company, defendant-appellant.   I. Plaintiff established no cause of action against the defendant fireworks company as a corporation because that corporation was not connected in any way with the transaction involved.   (*Schmedes* v. *Deffaa*, 153 App. Div 819, 214 N. Y. 675; *Hartell* v. *Simonson & Son Co.*, 218 N. Y. 345; *Standard Oil Co.* v. *Anderson*, 212 U. S. 215; *Wyllie* v. *Palmer*, 137 N. Y. 248; *Higgins* v. *Western Union Tel Co.*, 156 N. Y. 75; *McNamara* v. *Leipzig*, 227 N. Y. 291; *Wright Steam Engine Works* v. *Lawrence Cement Co.*, 167 N. Y. 440; *Anderson* v. *Boyer*, 156 N. Y. 93.)   II. Plaintiff failed to establish any cause of action against either of the defendants on the ground of negligence.   (*Tucker* v. *New York Central & Hudson Riv. R. R. Co.*, 124 N. Y. 308; *Gloshinsky* v. *Bergen Milk Transp. Co.*, 279 N. Y. 54; *Carbone* v. *Mackchil Realty Corp.*, 296 N. Y. 154; *Vaughan* v. *Transit Development Co.*, 222 N. Y. 79; *Hoffman* v. *King*, 160 N. Y. 618; *Perry* v. *Rochester Lime Co.*, 219 N. Y. 60; *Beickert* v. *G. M. Laboratories, Inc.*, 242 N. Y. 168; *Mairs* v. *Baltimore & Ohio R. R. Co.*, 175 N. Y. 409; *De Salvo* v. *Stanley-Mark-Strand Corp.*, 281 N. Y. 333; *Loftus* v. *Union Ferry Co.*, 84 N. Y. 755.)   III. If any duty to safeguard these trespassers existed either in law or in fact, and if there was any failure in either respect, it was the fault of the fair company.  Their duty could not be delegated.   (*Birch-Field* v. *Davenport Shore Club, Inc.*, 262 N. Y. 499; *Barrett* v. *Lake Ontario Beach Improvement Co.*, 174 N. Y. 310; *Platt* v. *Erie Co. Agric. Soc.*, 164 App. Div. 99; *Arnold* v. *State of New York*, 163 App. Div. 253; *Thompson-Starrett Co.* v. *Otis Elevator Co.*, 271 N. Y. 36; *Employers' Liability Assur. Corp.*, v. *New York Linen Supply & Laundry Co.*, 239 N. Y. 560; *Dudar* v. *Milef Realty Corp.*, 258 N. Y. 415; *Walters* v. *Rao Elec. Equipment Co.*, 289 N. Y. 57; *Schwartz* v. *Merola Bros. Constr. Corp.*, 290 N. Y. 145.)   IV. The contract nowhere contained any promise on the part of the fireworks company in express and unequivocal language, to protect the fair company against its own negligence.  (*Perry* v. *Payne*, 217 Pa. 252; *Maynard* v. *Syracuse, Binghamton & N. Y. R. R. Co.*, 71 N. Y. 180.)

*Edmund S. Brown* and *Theodore A. Viehe* for Erie County Agricultural Society, defendant, appellant and respondent. I..Plaintiffs failed to establish that defendant agricultural society was legally responsible for the bomb which injured the infant plaintiff. (*Deyo* v. *Kingston Cons. R. R. Co.*, 94 App. Div. 578; *Matter of Mace* v. *Morrison & Fleming*, 267 App. Div. 29, 293 N. Y. 844; *Garlinger* v. *Linwood Constr. Co.*, 206 App. Div. 107; *Fragiacomo* v. *404–6 East 88th St. Realty Corp.*, 269 App. Div. 635; *English* v. *Merroads Realty Corp.*, 288 N. Y. 93; *Weinfeld* v. *Kaplan*, 282 N. Y. 348; *Hyman* v. *Barrett*, 224 N. Y. 436.) II. Plaintiffs failed to establish that defendant agricultural society was negligent. (*Fragiacomo* v. *404–6 East 88th St. Realty Corp.*, 269 App. Div. 635; *Kukkonen* v. *Cameron*, 263 App. Div. 760; *Hayes* v. *Borup*, 244 App. Div. 807; *Morse* v. *Buffalo Tank Corp.*, 280 N. Y. 110.) III. The alleged negligence of defendant agricultural society was not the proximate cause of the injuries to the infant plaintiff. (*Perry* v. *Rochester Lime Co.*, 219 N. Y. 60; *Babcock* v. *Fitzpatrick*, 221 App. Div. 638, 248 N. Y. 608; *Steeves* v. *City of Rochester*, 293 N. Y. 727; *Hall* v. *New York Tel. Co.*, 214 N. Y. 49; *Beickert* v. *G. M. Laboratories, Inc.*, 242 N. Y. 168; *Flaherty* v. *Metro Stations, Inc.*, 202 App. Div. 583, 235 N. Y. 605; *Di Biase* v. *Ewart & Lake, Inc.*, 228 App. Div. 407, 255 N. Y. 620.) IV. Defendant agricultural society owed no duty of care to plaintiffs. (*Palsgraf* v. *Long Island R. R. Co.*, 248 N. Y. 339; *Larmore* v. *Crown Point Iron Co.*, 101 N. Y. 391.) V. The order and judgment directing verdicts in favor of the agricultural society against the fireworks company should be affirmed. (*Dudar* v. *Milef Realty Corp.*, 258 N. Y. 415; *Long Island R. R. Co.* v. *American Bridge Co.*, 175 App. Div. 170, 225 N. Y. 692; *Scott* v. *Curtis*, 195 N. Y. 424; *Schwartz* v. *Merola Bros. Constr. Corp.*, 263 App. Div. 631, 290 N. Y. 145; *Phoenix Bridge Co.* v. *Creem*, 102 App. Div. 354, 185 N. Y. 580; *Dunn* v. *Uvalde Asphalt Paving Co.*, 175 N. Y. 214; *Oceanic Steam Navigation Co.* v. *Compania Transatlantica Espanola*, 134 N. Y. 461;.*Carroll* v. *City of Dunkirk*, 234 N. Y. 579.) VI. The fireworks company is not entitled to be indemnified by the agricultural society.

*Edward B. Horning* for plaintiffs, respondents. I. The negligence, causation and foreseeability issues were properly left

to the jury and the findings thereon are amply supported. (*Perry* v. *Rochester Lime Co.*, 219 N. Y. 60; *Travell* v. *Bannerman*, 174 N. Y. 47; *Babcock* v. *Fitzpatrick*, 221 App. Div. 638, 248 N. Y. 608; *Crowley* v. *Rochester Fireworks Co.*, 183 N. Y. 353; *Conklin* v. *Thompson*, 29 Barb. 218; *Wyllie* v. *Palmer*, 137 N. Y. 248; *Birch-Field* v. *Davenport Shore Club, Inc.*, 262 N. Y. 499; *Deyo* v. *Kingston Cons. R. R. Co.*, 94 App. Div. 578; *Parnell* v. *Holland Furnace Co.*, 234 App. Div. 567, 260 N. Y. 604; *Clifton* v. *Patroon Operating Corp.*, 271 App. Div. 112; *O'Neill* v. *City of Port Jervis*, 253 N. Y. 423.)   II. The court correctly disposed of the cross claims. (*Sroka* v. *Halliday*, 39 R. I. 119; *Bunnell* v. *Blue Grass Fair Assn.*, 206 Ky. 462; *Spenzierato* v. *Our Lady Monty Virgine Soc.*, 112 N. J. L. 93; *Platt* v. *Erie Co. Agric. Soc.*, 164 App. Div. 99; *Roper* v. *Ulster Co. Agric. Soc.*, 136 App. Div. 97; *Fox* v. *Buffalo Park*, 21 App. Div. 321; *Schwartz* v. *Merola Bros. Constr. Corp.*, 290 N. Y. 145.)

CONWAY, J.   Defendants appeal from a judgment of the Appellate Division, Fourth Department, which affirmed a judgment of the Supreme Court, in favor of the infant plaintiff and a judgment in favor of his father, after a jury trial.

Originally, two actions — subsequently consolidated — were instituted against both defendants, one in favor of the infant by his guardian ad litem to recover for personal injuries including the loss of his left hand and injuries to his face, head and abdomen, and another by the father for damages sustained by him by reason of the injuries to the infant plaintiff. The injuries resulted from the explosion of a bomb which had been taken by the infant plaintiff's older brother from the fairgrounds of the defendant Erie County Agricultural Society (hereinafter referred to as the " Agricultural Society ") where the defendant International Fireworks Company (hereinafter called the " Fireworks Co.") had furnished a display of fireworks. Although the piece of fireworks was called a bomb by the witnesses it was not of the size or shape we think of as a bomb or which we see at night on highways to warn of road repairs. It was green in color, was small enough to be held in one hand and was open at the top.

Each defendant asserted a cross claim over against the other. The jury returned a verdict in favor of the plaintiffs against

both defendants, and it also returned a verdict of " no cause of action " on the cross claim of each defendant. Subsequent to the trial, the court by an order (1) denied motions by both defendants to set aside the verdict in favor of plaintiffs (2) denied the Fireworks Co.'s motion to set aside the verdict of " no cause of action " on its cross claim against the Agricultural Society and for a directed verdict thereon and (3) *granted* the motion of the Agricultural Society to set aside the verdict of " no cause of action " on its cross claim against the defendant, Fireworks Co. and granted judgment over to the Agricultural Society against the Fireworks Co. for the amount of plaintiffs' verdict " or so much thereof as the defendant, Erie County Agricultural Society, is compelled to pay by reason " thereof. In addition to the appeal from the judgment by both defendants, the Fireworks Co. appeals from the affirmance of the above order, and the Agricultural Society appeals from the affirmance of that portion which denied its motion to set aside the verdict in favor of plaintiffs.

On this appeal defendants contend that their motions for non-suit and dismissal of the complaint should have been granted because (1) plaintiffs established no negligence on the part of either defendant, and (2) if any negligence was shown, it was not the proximate cause of the infant plaintiff's injuries. In view of the jury verdict in favor of plaintiffs and the affirmance by the Appellate Division, we must affirm unless we hold *as matter of law* that the accident was not foreseeable or that a new and independent effective cause intervened between the defendants' negligence and the accident. That we cannot do on this record.

We all agree that there is sufficient evidence from which the jury could find that to leave unguarded and accessible to children, who concededly were in and about the fairgrounds, an explosive such as is here involved, constitutes negligence. Some of the evidence in the record which supports that conclusion is as follows:

The Agricultural Society conducted the annual Erie County Fair upon premises owned by it at Hamburg, N. Y. The purpose of the fair was to stimulate interest in agriculture, 4 H groups and other farming activities. In order to attract a crowd, in addition to the educational and agricultural exhibits, there were a number of " free acts " or attractions, and a " great number ", " a couple of hundred ", concessions.

The fair was conducted for one week and admission of sixty cents was charged for adults and twenty-five cents for children from ten to fourteen years of age. Children under ten years of age were admitted free and on Mondays all school children were admitted free if they participated in the " school activities ".

In 1945, the fair opened on Monday, August 20th and closed on Saturday August 25th. The record of paid admissions for the week was 93,748 which included 17,169 parking tickets for automobiles. The Agricultural Society treasurer estimated that about 15 or 20% of the crowd were children, except on Monday when the percentage was higher. At the 1945 fair there were six or eight " free acts ", including wrestling matches, an acrobatic act called the " Peaches High Act " and a nightly display of fireworks.

To provide for the fireworks display, the Agricultural Society entered into a contract with the Fireworks Co. in which the Fire-Works Co. agreed to " furnish " an " exhibition of fireworks " in accordance with a program attached to the contract for $250 per night. The contract in which the Fireworks Co. was the party of the first part and the Agricultural Society was the party of the second part provided in part:

" The party of the first part agrees to furnish an experienced pyrotechnist, party of the second part to furnish laborer to dig holes.

" The party of the First part agrees to furnish all lumber required.

" The party of the First part agrees to pay all freight, express and cartage charges.

" The party of the First part agrees to pay all traveling and other expenses of pyrotechnist necessary for said exhibition.

" The party of the second part agrees to furnish a secure and dry shelter for storage of fireworks materials in the event of rain or stormy weather. * * *

" The party of the second part agrees to furnish and set up rope lines, if required for the protection of the public.

" The party of the second part agrees to furnish ample police protection to party of the first part for the protection of its property, and the firing of the exhibition without interferences from the public.

" The party of the second part agrees to procure any and all permits or licenses which may be required by the municipal authorities.

" The party of the first party agrees to indemnify and save harmless the party of the second part from any and all liability to any person or persons for or by any reason of any condition whether defective, or otherwise, or [sic-of] any fireworks, apparatus, equipment or fixtures furnished by said party of the first part in connection with the exhibition hereinbefore agreed to be given, and will indemnify and save harmless the party of the second part from any and all liability to any person or persons, for or by any reason of any act or omission of said party of the first part or any of its agents, servants or employees."

In a letter dated July 30, 1945, the Agricultural Society requested of the Fireworks Co. information required for the society's application for the permit. (See Penal Law, § 1894-a, subd. 3 par. d.) The Fireworks Co. furnished the information requested. The application was made by the Agricultural Society, and the permit was issued by the town clerk and permit authority of Hamburg, New York. The " Name of Permitee ", however, is stated therein as " International Fireworks Co., Jersey City N J ", and not as Agricultural Society.

In performance of the contract, Fireworks Co. shipped twelve boxes of fireworks to the fairgrounds. Two boxes were to be used each night. The boxes contained two types of fireworks: (1) " aerial bombs " which were fired from iron pipes or " mortars " set in the ground; these bombs contained a " lifting charge " so that when lighted they were propelled into the air where they burst with different effects, and (2) " ground bombs " which were connected on the ground in a series of twenty-five and the purpose of which was only " to go off and make a loud noise ". On delivery at the fair grounds the boxes were stored in a small brick building about 12 by 12 feet with a tile roof, known as the " Meter House ", which contained a water meter and which was used for no other purpose.

The Fireworks Co. sent one Murray, its vice-president and general manager, a man seventy-five years of age with about fifty-seven years' experience in the fireworks business, to supervise the exhibition. It also sent one Davito, an experienced fireworks operator and employee of the company for twenty-three years.

Under Murray's supervision, an employee of the Agricultural Society dug the holes for the mortars which had been shipped to the fairgrounds by the Fireworks Co. and Davito installed them. Thus, ninety or ninety-five mortars were placed in a line about 100 feet long, and about 25 feet away from the line of mortars and parallel to it a shallow ditch was dug to hold the " ground bombs ".

This firing area was on the grass inside the oval or " infield " formed by the race track at the fairgrounds. The oval ran generally from northwest to southeast and was bordered by the grandstand, horse stables, pari-mutuel booth, bandstand, automobile building, concrete dance platform, agriculture exhibit and education exhibit. Inside the oval on the northerly side, directly opposite the grandstand, is a smaller oval formed by the horse show ring. The firing area was located between the horse show ring and the inside rail on the southerly side of the race track. It was about 100 feet away from the rail and ran parallel to it for about 100 feet.

At the fireworks exhibition on Monday night, August 20th, the first night of the fair, three bombs failed to explode, two were ground bombs which had become wet when the ground was sprinkled with water and the third was an aerial bomb on which the fuse had broken. At that time Davito picked up the three bombs, wrapped them in a piece of paper and put them in an empty box. He took them back to the meter house where they remained until the following Saturday afternoon. At about five o'clock on Saturday afternoon, August 25, 1945, the superintendent of the Agricultural Society, took the last two unopened boxes of fireworks to the firing area in a fire truck. Davito testified that at the same time he took the box containing the three defective bombs to the firing area, carrying it halfway and then putting it on the truck. His testimony in substance was that the three bombs, wrapped in newspaper, were in the bottom of an empty wooden box. He piled ten extra mortars on top of them in that box and then set two empty boxes on top of the one containing the mortars and the three bombs. Murray said that he and Davito planned to ship the three bombs back to the Fireworks Co.'s factory because it was not considered " safe to bury them on a Fair Grounds."

After the show (which was "late" on Saturday night) they were "a little bit in a hurry" because they wished to make the 11:45 P.M. train to New York. The three bombs were taken out to the firing point to be packed up with the mortars so that Davito and Murray could leave as soon as the display was over. The three bombs were to be nailed up in a box with some mortars and left out on the fairgrounds all night and then in the morning were to be picked up by a truck and shipped back to the Fireworks Co. Thus they remained there in the firing area until they were missed nearly five hours later.

Davito claimed that while he was checking fuses on the line of fireworks ten or fifteen minutes before they were to be displayed at 10:00 P.M. he noticed that the three boxes were "tumbled over", the mortars were out on the ground, and the three bombs were gone.

At the fair on that Saturday evening, there was a band concert at 7:30 P.M. and then there was a series of "free acts". The first was a stage show performed on a stage in the grass oval of the race track next to the northwest inside rail of the track opposite the bandstand which was on the opposite side of the track in front of the grandstand. Both those platforms were only about 300 to 400 feet from the firing area. The "Peaches High Act" followed the stage show and then approximately four wrestling matches were presented. The "Peaches High Act" was also in the infield about 300 feet northwest of the firing area. The wrestling matches were held at a point on the race track in front of the grandstand about 350 feet from the firing area.

The race track lights were on until the fireworks display was set off and the infield was so well lighted that several witnesses said that a person could read a newspaper there. The inside rail of the race track was about 3½ feet high and there were five gates opening into the infield. There was evidence of a considerable number of people being in and about the infield on Saturday night. The night chief of the fair police testified that "we had our men around the free acts and they would keep the crowds back a little farther"; the actors' tents in the infield were roped off "to keep the people from going through"; there were policemen in the infield while the "Peaches High Act" was going on to keep

people " away from the guy wires ", and police were also stationed around the wrestling matches. The assistant night chief said that at about five minutes before the fireworks display was to go on six policemen would go over to the firing area " to keep the crowd back "; they were posted " all the way around that area to keep people from going through or on that bombing area ".

At about 8:30 P.M., the infant plaintiff's brother, William Kingsland, aged thirteen, Robert A. Shuttleworth, aged thirteen, and William Ryan, aged twelve, together with Shuttleworth's sister, aged fifteen, entered the fairgrounds by climbing over a fence on the Quinby Drive side of the grounds. The boys had attended the fair on previous nights. While there is some variance in the testimony of the boys as to exactly what they did before they came to the firing area and took the bombs, it seems that they walked over to the " midway " and visited various buildings, concessions and exhibits. They then went over and saw the " Peaches High Act ", and the Shuttleworth girl left the three boys. Then they went to where the wrestling matches were to be presented, but the wrestling ring was being set up so they decided to take another walk on the " midway ". A short while later they returned to the infield and in walking over to the wrestling matches passed near the firing area. They passed some boxes laying on the ground and the Kingsland boy went back and took three bombs and two fuses from one of the boxes. He retained one bomb for himself and gave one bomb and a fuse to each of the other two boys. The testimony of the Kingsland boy as to the condition in which he found the bombs, and which was generally corroborated by the other two boys, is at variance with the testimony of Davito as to the condition in which he left them. The Kingsland boy testified that he saw an open box with a partition in the middle of it which was " standing up " on end so that the partition made a " shelf ". In the bottom half he said were " some mortars or pipes * * * about ten of them in the bottom there." On the center shelf or partition " there was three [bombs] on the outside bigger ones than the ones I took and there was three in a paper bag or some newspaper on the top ". The six bombs " were sitting, the three were sitting on the outside of the paper and there was two or three or four on the inside of the

paper ''.  He did not take the larger bombs but reached into the paper bag or newspaper which was '' laying flat down '' and '' already opened at the top '' and took out the smaller three bombs and the two fuses.

The boys said they were in the firing area from three to five minutes.  They saw no one guarding the fireworks and no one told them to go away.  They hid the bombs and fuses under some horse show box seats and then went over to see the wrestling matches.  After the wrestling matches and the fireworks display they obtained their bombs and went home with Shuttleworth's sister who had rejoined them.

The Kingsland boy described the bomb which he had as being similar to plaintiff's Exhibit 11, a '' ground '' bomb which was green in color, '' except that it had a bigger neck up here and it was burned along the side here.  *  *  *  Well, there was a bigger neck on here and it was singed and burned along the sides and there was no wick in there and you could look right down into it; it was black down in there.''  The Ryan boy said he also had a green bomb and described it as follows: '' The bomb was light and it was like, sizzled, around here, burned like and there was a hole in it and you could look down in. Q. Now, this bomb that I have here, plaintiff's Exhibit 11, has a fuse down in there that you can see, hasn't it?  A. Yes. Q. Was there any such fuse on the bomb you had?  A. No. Q. How did that hole look?  A. It was shorter than that and a little fatter.  You could look down in it; it was all black down in there.''  The Shuttleworth boy said the bomb he had was similar to plaintiff's Exhibit 10 which was an '' aerial '' bomb.

Although the boys admitted that they knew the bombs were fireworks and that they intended to explode them the next night, they said they had never before seen bombs similar to them.

Murray, the Fireworks Co.'s general manager, conceded that the mixture of chlorate of potash, dry aluminum powder, sulphur and black metal antimonium which was contained in the ground bombs was '' more powerful than gunpowder ''.  The purpose of the bombs was to make a '' loud noise ''; they were not '' weak '' bombs and could be heard a distance of '' a couple of miles ''.  When asked if he kept count of the exact number of bombs which were fired at each performance he said, '' You

bet your life." When asked if he had attempted to light one of the defective bombs replied, " I don't try those * * * that is why I am living today ". There was also expert testimony presented by plaintiffs that " practically any mixture of this sort is a very vicious explosive " and that it could be exploded by fire, friction or concussion.

As the boys approached the Kingsland home which was about two miles from the fairgrounds, they met Mrs. Kingsland, William's mother, who came from some woods near the road. William showed her the bomb and told her where he got it, and she told him he would have to take it back to the fairgrounds. It was " pitch dark ", and she did not take the bomb in her hands. When William got home he put the bomb on the kitchen table where it remained for about an hour. His mother told him to take it out and put it underneath the porch. Instead William took it to the foot of his bed. In the morning his little brother and two little sisters had it in the kitchen. William's twelve-year-old brother, Eugene, took it from them and gave it back to William in a bedroom. The bomb was on the dresser and William's younger brother Robert, aged seven, the infant plaintiff, took it and ran out into the yard. Shortly thereafter the explosion occurred which caused the serious injuries here involved.

Mrs. Kingsland testified that she met the boys on the highway and that William showed her his bomb. She said, " I really didn't look at it. I noticed the Shuttleworth boy had one without the wick in it and the Ryan's looked a little bit burned and Bill's didn't look so good, so I didn't pay much attention to it until I saw it in the kitchen." She told William to take it back.

When she got home, and while William was taking off his clothes, the bomb was on the table. She said she looked at it and her description of it was as follows:

" A. It was similar to this but had a larger neck. You could look right through the hole, there was no wick, you could see a reflection on the insides.

" Q. Did it have any black mark that you could recall? A. It was singed down the side.

" Q. And how wide a singe, if you can recall? A. I would say half an inch.

"Q. About half an inch wide, was it? A. About half an inch wide.

"Q. Had you ever seen anything that looked like that before? A. No, sir, I never did.

"Q. You had never had any experience with these ground bombs, had you? A. No, sir. * * *

"Q. Did you know it was a bomb? A. No, sir, I never saw anything like it before.

"Q. Why did you want him to return it to the Fair Grounds? A. Because I thought the thing looked like a dud to me and I thought the fireworks company would take it back and they would refund." She then told William to take it out and put it under the porch steps because she "didn't want it in the house".

Mrs. Kingsland said she "never laid eyes on the bomb in the morning". She had seven children, ranging from three to sixteen years of age, "they all wanted their breakfast at the same time", and she "was busy getting things ready". She thought "Bill had obeyed" her and put the bomb under the porch steps.

Thus there was evidence from which the jury could find that defendants had left harmless looking, but highly dangerous, bombs exposed and unguarded in a place of public amusement where a large number of people including children were known to be present. Clearly, the triers of the facts could find that defendants should have foreseen the probable result that children would take those apparently discarded bombs and that they, their playmates or some other child who might come in contact with the bombs would explode them and be injured thereby.

The fact that the boys may have been trespassers on the fairgrounds is immaterial, since there was sufficient evidence that the article which caused the injury was "inherently dangerous". One who keeps an explosive substance is "bound to the exercise of a high degree of care to so keep it as to prevent injury to others." (*Travell* v. *Bannerman,* 174 N. Y. 47, 51.) The degree of care required is commensurate with the risk involved, depending upon such circumstances as the "dangerous character of the material" and its accessibility to others, particularly children whose presence should have

been anticipated, regardless of whether or not they are trespassers. (See *Beickert* v. *G. M. Laboratories,* 242 N. Y. 168, 172, 174–175; *Travell* v. *Bannerman, supra;* 35 C. J. S., Explosives, § 5, pp. 227–231; 22 Am. Jur., Explosions and Explosives, §§ 14, 18.)

The issue of proximate cause was also properly left to the jury. In *Carlock* v. *Westchester Lighting Co.* (268 N. Y. 345, 350), we said: " Where harmful consequences are brought about by intervening and independent forces, *the operation of which might have been reasonably foreseen,* there is no break in the chain of causation of such character as to relieve the actor from liability." (Emphasis supplied.)

In discussing " proximate cause ", as applied to cases where explosives are wrongfully carried away by children, it is stated in 35 Corpus Juris Secundum, Explosives (§ 5, pp. 231, 232): " *Proximate cause.* Notwithstanding the person injured is a child, nevertheless to impose liability defendant's act must have been the proximate cause of the injury. So, where explosives are wrongfully carried away from the place in which they are stored by children capable of understanding the wrongful nature of their act, the negligence in keeping or storing cannot be regarded as the proximate cause of a subsequent injury to the child or other children by their use, where defendant has done nothing to invite or provoke the act of the child *and there is nothing in the circumstances which would cause it to be foreseen.* * * * Where a child, through defendant's original negligent act, has obtained possession of explosives and his parent, with knowledge of their character and of the fact that he has them in his possession, fails to take them away from him, the causal connection between defendant's act and a subsequent injury to the child is broken, but *the parent must have had knowledge of the character of the article.*" (Emphasis supplied.)

The taking and carrying away of the fireworks here was readily foreseeable. This case is not controlled by *Perry* v. *Rochester Lime Co.* (219 N. Y. 60). There the defendant stored a chest of nitroglycerin caps on a strip of land between its warehouse and the Erie Canal in Rochester where boys were accustomed to play and fish. In stating the facts this court (per Cardozo, J.), was careful to point out that the caps were

packed in tin boxes and that at least thirty-three tin boxes were packed in wooden boxes; that " the wooden boxes were without marks; they had sliding covers, which were closed " (p. 62); and that the boys took one of the wooden boxes from the open chest. Thus the caps were stored inside three containers only the largest of which was open. The following portion of the opinion indicates the emphasis which we placed on the circumstance that the caps were thus hidden and not exposed and which clearly distinguishes that case from the case at bar (pp. 63–64): " The defendant stored the explosives without a permit and in violation of an ordinance. It stored them, moreover, in a public place. It thus became a wrongdoer, and answerable as such for the proximate consequences of the wrong. It became answerable, in other words, for those consequences that ought to have been foreseen by a reasonably prudent man [cases cited]. But we cannot say that what was done with these explosives was something that ought to have been foreseen. The chest, it is true, was open, but *the caps were not exposed. A large wooden box hid them.* The boys did not play with caps scattered about loosely. They did not play at all. They carried away a large wooden box containing thirty-three smaller boxes, and appropriated the contents. They stole the caps in quantities that must have carried notice even to boys of their age that the act was wrongful. Indeed, there is good reason to believe that they stole, not for play, but for profit, intending to sell the spoils as junk. The defendant had done nothing to invite or provoke this theft. *It had not scattered the caps about, or even exposed them to view, so that children might feel tempted, and perhaps licensed, to handle and play with them. It had packed the caps in tins, and then hidden the tins from sight by packing them in wooden boxes.* The theft of one of the boxes was no more to be looked for than the theft of the whole chest. It was possible, of course, that the contents would be stolen by boys, or even by adults. But nothing in the situation made that outcome probable. In short, a series of new and unexpected causes intervened and had to intervene before these explosives could bring death to Perry. Not one of them was within the range of reasonable expectation. *Boys discovered the hidden caps,* stole a box, carried it to their home a half a mile away, and killed a playmate. His death was not

the proximate result of the open chest in the highway." (Emphasis supplied.)

It is also to be noted that our holding in that case was carefully limited by the following statement (p. 65): "Nothing in our ruling is in conflict with the recognition of a duty to protect the young and heedless from themselves, and guard them against perils that may reasonably be foreseen. To define the orbit of that duty is unnecessary now (*Travell* v. *Bannerman*, 71 App. Div. 539; 174 N. Y. 47 [and citing other cases]). It is enough to assume that there are times and circumstances that will call the duty into play. The remoteness of the relation controls our judgment, and distinguishes the case at hand from others where liability has been enforced. Thus, in *Travell* v. *Bannerman* (71 App. Div. 439; 174 N. Y. 47), the explosives were thrown into a vacant lot, they were apparently mere refuse, and the defendant ought to have foreseen that a child would think itself at liberty to handle them." Here there was evidence that the bombs were left exposed from about 5:00 P.M. to nearly 10:00 P.M. at the firing point where fireworks had been displayed at the fair on five consecutive, preceding nights. The very purpose of the display was to attract crowds in which there was concededly a considerable number of children. These particular boys had been there on previous nights. Indeed it is difficult to think of a place more attractive to children than a fixed fireworks display area at a county fair and an article more inviting as a souvenir or plaything than a fireworks bomb, either exploded or unexploded.

We need not go as far as what appears to be the trend of modern legal thought evidenced in the following quotation from section 522 of Volume 3 of the Restatement of the Law of Torts:

"One carrying on an ultrahazardous activity is liable for harm  *  *  *  although the harm is caused by the unexpectable

"(a) innocent, negligent or reckless conduct of a third person, or

"(b) action of an animal, or

"(c) operation of a force of nature.

" *Comment:*

" a. *Rationale.* The reason for imposing absolute liability upon those who carry on ultrahazardous activities is that they have thereby for their own purposes created a risk which is not a usual incident of the ordinary life of the community. If the risk ripens into injury, it is immaterial that it is made effective in harm by the unexpectable action of a human being, an animal or a force of nature. This is so irrespective of whether the action of the human being which makes the ultrahazardous activity harmful is innocent, negligent or even reckless
\* \* \*."

Defendants contend that the chain of causation was broken by the intervention of the mother's alleged negligence in failing effectively to dispose of the bomb. Certainly on this record it was a question for the jury whether the mother should have apprehended any special danger from what appeared to be a burned-out fireworks bomb or " dud ", and, at any rate, whether she did what was reasonably indicated, by telling her son to leave the object outdoors. We cannot hold on this record *as a matter of law* that the mother's conduct broke the chain of causation. At most that was a matter for the jury.

Other cases cited by defendants are readily distinguishable from the instant case on the ground that they do not involve " inherently dangerous " objects left exposed and accessible to children at a place of public amusement.

*Babcock* v. *Fitzpatrick* (221 App. Div. 638, affd. 248 N. Y. 608), like the *Perry* case (*supra*) concerned the wrongful taking by boys of hidden dynamite caps. There the defendant was engaged in laying a pipe line in a rural area. His workmen stored some tools and a 700-pound, cast-iron water valve under the porch of a nearby private house. Underneath the water valve they stored a box of percussion caps which, however, was visible from the road in front of the house. A nephew of the owner of the house found the caps, carried them a considerable distance away and distributed them to several boys including the infant plaintiff who was aware of the nature of the caps and the method of exploding them. He placed a string inside the cap, set fire to the string and the cap exploded in his hand. In affirming the reversal of a judgment in favor of plaintiff which had been recovered on the theory that defendant had maintained an " attractive nuisance " we held that there

was *no negligence* on the part of defendant and the placing of the caps under the porch was not the proximate cause of the injury.

*Hall* v. *New York Tel. Co.* (214 N. Y. 49, 52) involved a bottle of denatured alcohol left by defendant's employees at the side of a highway, and we specifically said that the alcohol " was not of necessity dangerous. Neither was it such an apparatus or article as would induce or allure children to play with it."

In *Morse* v. *Buffalo Tank Corp.* (280 N. Y. 110), the defendant left a drip can underneath the faucet of a gasoline drum and one night after the close of business several boys carried it away and threw the contents of the can on a bonfire. The infant plaintiff running past the fire fell into it and was injured. There again we specifically stated (p. 116): " While highly inflammable, the use of gasoline does not place the case at bar within the exception concerning the use of inherently dangerous materials. (*Travell* v. *Bannerman,* 174 N. Y. 47.)"

In *Beickert* v. *G. M. Laboratories* (242 N. Y. 168, *supra*), the infant plaintiff was burned by the igniting of some pieces of film which another boy had picked up in the rear of defendant's plant. We there again pointed out (pp. 174–175) that the case was distinguishable from *Travell* v. *Bannerman* (*supra*) and said (p. 172): " The rule seems to be thoroughly settled, at least in this State, that a plaintiff cannot recover in cases of this character unless the article which causes the injury is inherently dangerous. These pieces of film were not inherently dangerous, and only became so when they were ignited."

The liability as between the defendants on their cross claims was properly decided. As stated above (pp. 414, 415) after the verdict the trial court (1) denied motions by both defendants to set aside the verdict in favor of plaintiffs, (2) denied the Fireworks Co.'s motion to set aside the verdict of " no cause of action " on its cross claim and for judgment over against the Agricultural Society and (3) *granted* the Agricultural Society's motion to set aside the verdict of " no cause of action " on its cross claim and for judgment over against the Fireworks Co.

The Fireworks Co. contends first, that its motion for a non-suit and a directed verdict should have been granted because it was not an " independent contractor " to present a fireworks

display but only a " seller of fireworks " who sold certain display pieces and also furnished a pyrotechnist who became the *ad hoc* employee of the Agricultural Society. The court charged that the Agricultural Society was not responsible for any acts of negligence of the Fireworks Co.'s employees. That was a ruling in effect that the Fireworks Co. was an independent contractor and that the pyrotechnists had not become the *ad hoc* employees of the Agricultural Society. No other conclusion was proper on this record. There is evidence that the Fireworks Co. was one of the largest manufacturers and exhibitors of fireworks in the country. The contract between the defendants was not a mere bill of sale of fireworks and a loan of pyrotechnists. It was a formal agreement prepared by the Fireworks Co. in which it agreed " to furnish * * * *an exhibition of fireworks* " in accordance with an attached " program ". (Emphasis supplied.) In addition to furnishing an " experienced pyrotechnist " it agreed " to furnish all lumber required ", to pay " all freight, express and cartage charges " and to pay " all traveling and other expenses " of the pyrotechnist. More significant is the fact that it agreed to indemnify the Agricultural Society from liability by reason of any condition of the " fireworks, apparatus, equipment or fixtures furnished by " it " in connection with the exhibition hereinbefore agreed to be given ", and " from any and all liability * * * by reason of any act or omission of * * * [the Fireworks Co.] or any of its agents, servants or employees." It also provided that the Fireworks Co. was to be paid $1,500 " immediately after this contract has been fulfilled ".

The program attached to the contract is headed " GRAND FINALE to be given each evening. Price $250.00 per night. Synchronically time fused so that each shell ascends in rapid rotation to form a continuous and symmetrical whole." The program then lists the quantity, size and name of the fireworks to be used.

In furnishing the information for the display permit the Fireworks Co. stated that Mr. Murray, its vice-president and general manager, " plans to take charge and fire it himself." Thus it was clearly not intended that the specialized work of discharging these fireworks was to be under the control of the

Agricultural Society officials, and the actual performance of the contract confirms that conclusion. Aside from furnishing an employee to dig holes for the mortars and a truck to carry the fireworks in nailed-up boxes from the meter house to the firing area, the handling and discharging of the fireworks was completely under the supervision and control of Murray, assisted by Davito. In fact, Murray on his own initiative and without consulting the officials of the Agricultural Society varied the program submitted to the Society. In submitting the program to the Agricultural Society the Fireworks Co. had stated: "In the presentation of this program we would like it understood that this binds us in no way as to the actual order of firing, but it will be fired in such a manner that, in our good judgment and wide experience will obtain the best and most pleasing results". Finally, the fact that Murray and Davito planned to ship the three defective bombs back to the Fireworks Co.'s factory indicates that the relationship between the parties was not merely that of a vendor and vendee of fireworks. Thus, the evidence is conclusive that the Fireworks Co. without any interference on the part of the Agricultural Society had charge of the fireworks material and had complete control over the details of the work in presenting the exhibition and over the men who performed it. What was said in *Deyo* v. *Kingston Cons. R. R. Co.* (94 App. Div. 578, 580–581) is applicable here: "The record in this case, however, very clearly shows that neither the Pain Company nor the persons whom it sent to do the work had assumed the relation of servant towards this defendant. That company was one of the best-known and largest *exhibitors* of fireworks in the country. That was its own individual and independent business. And all that was done in the matter of sending off fireworks that evening upon the defendant's grounds was done by that company as an independent contractor. The defendant had no control whatever over the details of the work, nor over the men who performed it."

*Wyllie* v. *Palmer* (137 N. Y. 248) is not to the contrary. There the court found that there was merely a sale of fireworks; that the 4th of July citizens committee "controlled and directed" the fireworks display; that the boy who discharged the rocket which caused the injury had been employed by

the defendant for the limited purpose of assisting another man " in handling and setting off the larger pieces ", and that he was directed to fire that particular rocket by a member of the committee.

The Fireworks Co. also argues that in view of the provisions of section 1894-a of the Penal Law it " could not legally give a fireworks display " and that the exhibition was intended to be " solely the work of the Fair Company." Subdivision 2 of the statute provides: " Except as herein otherwise provided, any person who shall offer or expose for sale, possess or sell, furnish, use, explode or cause to explode any fireworks is guilty of a misdemeanor."

Subdivision 3 provides for permits for public displays and provides in part: " Notwithstanding the provisions of the preceding subdivision, the permit authority of a * * * village or town may upon application in writing, grant a permit for the public display of fireworks by *municipalities, fair associations, amusement parks or organizations of individuals.* The application for such permit shall set forth:

" a. The name of the body sponsoring the display and the names of the persons actually to be in charge of the firing of the display. * * * " (Emphasis supplied.)

The subdivision goes on to provide for other information to be included in the permit. It will be noted that the statute provides that only certain organizations including " fair associations," but not a fireworks company, may make application for a permit, *but it does not provide that the permit must be issued in the name of such organization.* The application in the instant case was made by the fair association and the permit was issued in the name of the Fireworks Co. which was actually in charge of the firing of the display. That the Legislature contemplated that a contract for the exhibition of fireworks might be entered into with a fireworks company, as was done here, is evidenced by subdivision 5 of the statute which provides that the permit authority shall require an adequate bond from the applicant " or from the person to whom a contract for such display shall be awarded * * *." Consequently it cannot be said as contended by the Fireworks Co. that it " could do no more than to sell the fireworks to the Fair Company. Anything further would be criminal ", and that

therefore the "display was solely the work of the Fair Company".

It is true as the court in effect charged that the Agricultural Society, as the owner and operator of the fairgrounds, had a duty to safeguard the public from these dangerous explosives and that the duty could not be delegated to an independent contractor. (See *Engel* v. *Eureka Club*, 137 N. Y. 100, 104–105; *Berg* v. *Parsons*, 156 N. Y. 109, 115; *Platt* v. *Erie Co. Agric. Soc.*, 164 App. Div. 99, 103–104; *Arnold* v. *State of New York*, 163 App. Div. 253, 262–263; *Roper* v. *Ulster Co. Agric. Soc.*, 136 App. Div. 97; Penal Law, § 1894-a; Labor Law, art. 16; Explosives, Federal Explosives Act, U. S. Code, tit. 50, ch. 8, as amd.) It is equally true that the Agricultural Society was free to indemnify itself by contract against liability resulting from the violation of such a duty. The contract provided that the Fireworks Co. would indemnify and save harmless the Agricultural Society from " any and *all liability to any person or persons for or by any reason* ": (1) " *of any condition whether defective or otherwise, or* [*sic*-of] fireworks, apparatus, equipment or fixtures furnished by " the Fireworks Co. and (2) " *of any act or omission of* * * * [the Fireworks Co.] or any of *its agents, servants or employees.*" (Emphasis supplied.) In our judgment the broad, clear language of the indemnity agreement covers the liability here imposed on the Agricultural Society. Murray, the Fireworks Co.'s vice-president and general manager, was in complete charge of the display. The Agricultural Society had provided a safe place for the storage of the fireworks. Without notice to the Agricultural Society and for their own convenience the employees of the Fireworks Co. on Saturday night removed the three defective bombs from the meter house where they had been stored since the preceding Monday night and exposed them at the firing point. The injury of the infant plaintiff was caused by " a condition * * * defective or otherwise " of a piece of fireworks furnished by the Fireworks Co. and by an " act or omission " of its employees.

The Fireworks Co. contends that the failure of the Agricultural Society to provide ample police protection to the firing area deprives it of any right to indemnity. The record shows, as found by the Trial Judge, that Murray could request any additional police protection he required and that such was the

substantial interpretation of the contract between the parties. No additional police protection was requested on Saturday night. The same appears to be true of "rope lines" which under the contract were to be furnished by the Agricultural Society "if required for the protection of the public". Neither defendant seems to have considered them necessary on any of the nights during the week of the fair. The claim of lack of police protection on the part of the Fireworks Co. appears to be inconsistent with its claim that there were very few people in the "infield" on Saturday night and that Murray and Davito did not need any help in taking care of their material in the firing area which was only 100 feet long and well lighted, and that they did in fact guard it diligently. The negligence of the Agricultural Society in failing to perform its nondelegable duty of protecting the public from these dangerous explosives was no more than what has been termed "passive negligence" and does not preclude the Agricultural Society from asserting its right of indemnity under the contract. Any other construction of the indemnity agreement would defeat its purpose. (*Dudar* v. *Milef Realty Corp.*, 258 N. Y. 415, 422; *Schwartz* v. *Merola Bros. Constr. Corp.*, 290 N. Y. 145, 154.)

The judgment should be affirmed, with costs.

LEWIS, J. (dissenting). As I view the decision about to be made it pays scant heed to the long established rule of tort law that "The proximate cause of an event must be held to be that which in a natural sequence, unbroken by any new cause, produces that event and without which that event would not have occurred." (*Rider* v. *Syracuse Rapid Tr. Ry. Co.*, 171 N. Y. 139, 147.) I cannot bring myself to the conclusion reached by a majority of the court that the act of William Kingsland committed at the defendant's fairgrounds on the night of August 25, 1945 — when he pilfered and took home a bomb — and those subsequent acts by which the bomb reached and injured his younger brother, were a sequence of events which ought to have been foreseen by the defendants in the exercise of the care which the law required of them.

Believing, as I do, that the facts in the present case fit squarely within, and call for the application of, the rule in *Perry* v. *Rochester Lime Co.* (219 N. Y. 60), I shall quote presently from this court's opinion in that case which, as I view it,

calls for a reversal of the judgment we are now reviewing. Before doing so I refer to testimony given by William Kingsland on the vital point in the present case. After stating that while walking about the bombing area he looked into a partitioned box which stood on end, he testified as follows on *direct* examination:

" Q. Now, will you tell us in your own words what was down there in the bottom? A. In the bottom was some mortars or pipes or whatever they call them, about ten of them in the bottom there.

" Q. And how many bombs did you see there? A. Well, there was three on the outside bigger ones than the ones I took and there was three *in a paper bag or some newspaper on the top.*

" Q. Where were those six bombs you now describe? A. Well, they were sitting, the three were sitting on the outside of the paper and there was two or three or four on the inside of the paper.

" Q. And were they on this center shelf or partition? A. Yes, sir.

" Q. They were all in there, were they ? A. Yes, sir.   *   *   *

" Q. *Now, you say you are not sure whether it was a paper bag or a newspaper that the others were in, is that right.* A. *Yes, sir.*

" Q. *But there were some others in some form of paper around them?*

" A. *Yes, sir.*   *   *   *

" Q. Now, you didn't take the larger bombs, did you? A. No, sir." (Emphasis supplied.)

Later, on cross-examination, the same witness revealed the following added details:

" Q. You went over to the boxes, is that it? A. Yes, sir.

" Q. And you saw some papers there then, didn't you? A. Yes, sir.

" Q. *And there was nothing visible when you first went over except the newspapers, was there?* A. *Newspapers; there was a grey bag or something like that.*

" Q. *In other words, all you saw when you got over there was newspapers and a grey bag, is that true?* A. *Yes, sir.*

" Q. And it wasn't until you got to opening up the bag and opening up the newspapers that you found anything, wasn't it? A. Well, I seen some bombs out there and then I knew there was some bombs in there.

"Q. That was after you opened up the newspaper, wasn't it? A. Well, I was sure I seen the bombs there first.

"Q. *You went over and saw a newspaper and the bag, didn't you. A. Yes, sir.*

"Q. *And then you started pawing around the newspaper and the bag, didn't you? A. That was a bag or newspaper.*

"Q. *And then after you got to pawing around the newspaper or bag, whichever it was, then you discovered the bombs, is that right? A. Yes, sir.*" (Emphasis supplied.)

From this undisputed testimony by the boy who, with knowledge of his wrongdoing, extracted the bombs from the newspaper or bag in which they were wrapped, it is clear that the bombs which he removed from the box were not exposed to view but were covered or wrapped and came into his possession only after his admitted well-directed " pawing " in the box.

It will serve no purpose to repeat testimony — accurately stated by Judge Conway — which describes the devious course by which the stolen bomb reached the infant plaintiff's home. It is enough to say that between the hour when William Kingsland retrieved the bomb from the hiding place he had chosen for it under the Fairground bleachers, and that hour in the morning of the following day when the bomb became the plaything of his younger brother at his home, new causes — not reasonably to be foreseen by the defendants and not amounting to actionable fault, as I view them — intervened before the bomb did its harm.

From facts adduced by the testimony already quoted, which I regard as decisive, I pass to an excerpt from the opinion written for this court in the *Perry* case (219 N. Y. 60, *supra*) — my purpose being to demonstrate by Judge Cardozo's recital that the facts which prompted a nonsuit in that case are strikingly similar to those proven in the case at bar. In the *Perry* case Judge Cardozo wrote for the court (pp. 62, 63-64): " The defendant stored explosives in a chest on the bank of the Erie canal in the city of Rochester. It stored them in a public place and in violation of law. Two boys carried away some of the boxes, secreted them in a barn, and handling the contents the next day, brought about an explosion. A little boy of eight years who was near them, was killed. The question is whether the defendant may be held to answer for his death. * * *

'' The defendant stored the explosives without a permit and in violation of an ordinance. It stored them, moreover, in a public place. It thus became a wrongdoer, and answerable as such for the *proximate* consequences of the wrong. It became answerable, in other words, for those consequences that ought to have been foreseen by a reasonably prudent man (*Atchison, T. & S. F. Ry. Co.* v. *Calhoun,* 213 U. S. 1, 7; *McDowall* v. *Great Western Ry. Co.,* L. R. [1903] 2 K. B. 331, 337; *Hall* v. *N. Y. Telephone Co.,* 214 N. Y. 49). But we cannot say that what was done with these explosives was something that ought to have been foreseen. *The chest, it is true, was open, but the caps were not exposed.* A large wooden box hid them. The boys did not play with caps scattered about loosely. They did not play at all. * * * *They stole the caps in quantities that must have carried notice even to boys of their age that the act was wrongful.* * * * The defendant had done nothing to invite or provoke this theft. It had not scattered the caps about, *or even exposed them to view,* so that children might feel tempted, and perhaps licensed, to handle and play with them. It had packed the caps in tins, and then hidden the tins from sight by packing them in wooden boxes. The theft of one of the boxes was no more to be looked for than the theft of the whole chest. It was possible, of course, that the contents would be stolen by boys, or even by adults. But nothing in the situation made that outcome probable. *In short, a series of new and unexpected causes intervened and had to intervene before these explosives could bring death to Perry. Not one of them was within the range of reasonable expectation. Boys discovered the hidden caps, stole a box, carried it to their home a half a mile away,* and killed a playmate. *His death was not the proximate result of the open chest in the highway.*'' (Emphasis supplied.)

After a careful reading of the record before us I find no facts which make inapplicable the rule of the *Perry* case (*supra*). There, as in the case at hand, a defendant was held to be a wrongdoer; but there — as I believe we should hold in the present case — the defendants' wrongdoing was held not to be the proximate cause of injuries which befell the infant plaintiff.

On the argument of the appeal herein counsel for the plaintiff-respondents suggested that the rule of the *Perry* case (*supra*) is no longer the law of this State. In support of that suggestion three cases in foreign jurisdictions were cited but the following decisions which cite and follow the rule of the *Perry* case give ample proof that the principle of law there applied still prevails in this jurisdiction (*Maloney* v. *Kaplan,* 233 N. Y. 426, 431; *Beickert* v. *G. M. Laboratories,* 242 N. Y. 168, 174; *Morse* v. *Buffalo Tank Corp.,* 280 N. Y. 110, 118; *Babcock* v. *Fitzpatrick,* 221 App. Div. 638, 642; *Demjanik* v. *Kultau,* 242 App. Div. 255, 257; *Hallenbeck* v. *Lone Star Cement Corp.,* 273 App. Div. 327, 332)..

Accordingly, I dissent and vote to reverse the judgment and dismiss the complaint.

LOUGHRAN, Ch. J., DESMOND and DYE, JJ., concur with CONWAY, J.; LEWIS, J., dissents in opinion in which FULD, J., concurs.

Judgment affirmed.