Charles J. Beckinella, J.
On April 3,1953 three Mne-yearold boys entered a room undeir the Brooklyn end of the Brooklyn Bridge. Not long after they entered the room flames enveloped the three boys. One escaped injury; the other two were not so lucky. One of these latter two unfortunate boys died 43 days later without ever leaving the hospital; the other boy spent *789 3 months and 19 days in the hospital as a result of the burns he suffered.
Thereafter, lawsuits were brought against the City of New York and three other defendants. The father of Robert Santiago, the boy who died 43 days after the accident, sued as administrator for the wrongful death of his son and for the pain and suffering the boy endured before his death; the other injured boy, Charles Carradine, sued to recover for the injuries he suffered and his father sued to recover for loss of the boy’s services and the medical expense he was put to. By order, all the actions were consolidated and tried before this court and a jury. During the trial the court dismissed the complaints as against all defendants except the City of New York and dismissed the cross complaint of the city against the three other defendants as well as the cross complaints involving the three other defendants. The jury returned verdicts in favor of the plaintiffs. Thomas Santiago, father of the deceased boy Robert Santiago, was awarded $20,000 on his cause of action for his son’s death and awarded $40,000 on his cause of action for the boy’s pain and suffering. Charles Carradine was awarded $65,000 for his injuries and his father Daniel Carradine was awarded $10,000 on his cause of action for the loss of his son’s services and for the expense he was put to on account of the accident.
Thereafter, the defendant City of New York moved to set aside the verdicts and this court reserved decision on all the motions made.
The city’s contentions are all-inclusive, namely, (1) it was not negligent; (2) (a) the injured boys were guilty of contributory negligence as a matter of law, or (b) the finding implicit in the jury’s verdict that the injured boys were free from contributory negligence was against the weight of the evidence; and (3) in any event the verdicts are excessive.
With respect to this last contention, i.e., that the verdicts are excessive, suffice it to say that the court finds that the quanta of the verdicts are fair considering the testimony given at the trial concerning the pain and suffering which the injured boys endured as a consequence of their having been burned. Neither are the verdicts for Robert Santiago’s wrongful death and Daniel Carradine’s cause of action for the loss of his son’s services and for his medical expenses excessive.
With respect to the city’s first two contentions, the authorities which warrant the disposition which this court is about to make of them will be in better perspective if considered in relation to the testimony adduced at the trial as to what transpired in *790 that room under the Brooklyn Bridge before the place went up in flames. Only two witnesses testified as to those events — they were Jose Argibay and Charles Carradine.
On direct examination, Jose Argibay, nine years old at the time of the accident, testified that in April, 1953 he lived on Fulton Street in Brooklyn across the street from the park or playground which was adjacent to the Brooklyn approach to the Brooklyn Bridge. He played in the park almost every day during the two years which preceded April, 1953. His several companions included Robert Santiago and Charles Carradine, the boys who were burned. Originally, the park, surrounded by a fence, contained slides, monkey bars, swings and other playground equipment. Then there came a time when some work was done on the Brooklyn Bridge. The fence surrounding the park was torn down and some of the playground equipment was removed from the park. There were rooms or storerooms underneath the approach to the bridge and the witness was familiar with them. Jose played in them with other boys during the Summer of 1952. At that time he noticed big paint cans in one of the rooms. He went into the room with the cans once or twice a week after the Summer of 1952. He saw paint on the open paint cans ‘1 and the rest just smelled like some kind of turpentine ”. The cans he saw in the room in the Summer of 1952 were there in 1953. He identified plaintiff’s Exhibits 13, 11 and 12 as cans which were in the room when the accident occurred. Before the fence was removed Jose and his companions used to scale the fence in order to gain access to the rooms under the bridge. They would also gain access through an opening in the back through the Washington Street side. The fence was torn down about three or four weeks before the accident. Then the boys went into the rooms under the bridge “ right through the front.” Children continued to play in the area after the fence was torn down. The rooms under the bridge had doors, but they were opened and unlocked. When Jose and the other boys went into those rooms they would play and fool around.
On April 3, 1953 Jose and four or five other boys went into two storerooms and played; then he, Robert Santiago and Charles Carradine went into another storeroom from the playground. While in the room, Jose lit a match and was looking around when it burned his fingers. He dropped the match and 11 Ba-boom the whole place went. ” “ All of a sudden everything just went up in flames ”. When Jose lit the match he noticed “ some type of liquid” near the can which was plaintiff’s Exhibit 13. After everything went up in flames he ran out, put *791 out his flames and went home, but before he did he saw that both Robert Santiago and Charles Carradine were in flames.
On cross-examination this witness Jose Argibay testified that neither he, Robert Santiago nor Charles Carradine spilled anything on the floor of the storeroom where the accident took place. The witness “ seen some kind of liquid on the floor, but we didn’t spill it.” The liquid was next to the can designated plaintiff’s Exhibit 13. Jose further testified that the match which caused the fire was lit by Charles Carradine who gave it to him. Robert Santiago was in a position to see the match being lit. The liquid that burst into flame “ smelled like turpentine,” “ could have been benzine. ” The witness did not think it was gasoline. Asked if it could have been kerosene he answered ‘ ‘ Probably. Maybe. I am not sure.” His father used to use something to clean paint brushes “that’s what the stuff smelled of.” “It was either turpentine or benzine.” It had a strong smell.
A statement made by the witness Jose Argibay was introduced into evidence. Parts of it contradicted testimony he gave on direct examination.
This was the statement: “ We were playing there about ten minutes. Charles took one of the matches from the match book and lit it. He then dared me to throw the lighted match into this liquid. I took his dare and threw the lighted match into the liquid which caused flames and then an explosion took place.”
Both on cross-examination and on redirect this witness, Jose Argibay stated that he did not remember making such a statement and couldn’t remember whether Charles Carradine said anything to him when he lit the match.
Charles Carradine, nine when the accident happened, testified on direct examination that he, Robert Santiago and Jose Argibay were playing together on April 3,1953. He and Robert Santiago went into a room under the Brooklyn Bridge. There was no fence separating the park area from the place where the “ explosion ” took place; the doors to the room were wide open; he had never been in the room before; there were no guards, no barricades nor any “keep out ” signs. In the room Charles Carradine saw some paint cans, paint stirrers, cloth on the wall and on the floor. He saw paint in the cans and a tar can. He saw a liquid coming out of a turned-over can about the size of plaintiff’s Exhibit 13. The liquid smelled like benzine. The next thing after Charles smelled the benzine there was an explosion. He did not light a match. He had no matches on his person. He did not dare anyone to light a match. There was no conversation among the boys immediately before the explosion. He did not remember seeing a match lit by anyone immediately *792 before the explosion. After the explosion the next thing Charles Carradine knew he woke up in the hospital. He was there for three and a half months from April 2 to July 22.
On cross-examination Charles Carradine testified that he was with Robert Santiago and Jose Argibay in the room where the explosion occurred. He knew nothing whatsoever about Jose Argibay having matches in his possession but was in the room for “ about a minute and a half ” prior to the explosion. No words were spoken by any of the boys to either of the others. He stood still but he didn’t know whether or not the others were stationary or moving around. Charles Carradine just looked, touched nothing and kept his hands in his pockets. He saw a can on the floor about three feet away from him; a green liquid was coming out of it; he also saw a tar can about five feet away from him. The liquid smelled like benzine. He did not know benzine would burn if a match was applied to it. Charles had no recollection of going to the Municipal Building on December 9, 1953 for a Comptroller’s hearing, but his attorney acknowledged that this took place.
At that hearing the following occurred:
‘‘ Question: Tell us how your accident happened, son. Just tell us how your accident happened as you remember it?
“Answer: We were playing on the swings and Joe went inside and we didn’t know where he went so we went to look for him. We saw him and we stayed about this much away from the door (indicating about four feet with his hands). And I didn’t know he lit it, and when he lit it, it blew out of the door and I got it.”
Charles Carradine reiterated his contentions that he was inside the room and that he saw and smelled the liquid, although at the Comptroller’s hearing he stated that he and Robert Santiago were outside the building. He still did not remember where Robert Santiago was with respect to himself even though he said in the Comptroller’s hearing that Robert Sanitago was outside the building when the explosion happened.
This court’s disposition of the city’s contention that it was not negligent is based upon Mayer v. Temple Properties (307 N. Y. 559) and Runkel v. City of New York (282 App. Div. 173). In the Mayer case a 12-year-old boy fell into an opening 55 feet deep and was killed. Only a frail wooden covering was placed over the opening. The Court of Appeals characterized this condition as a “ dangerous instrumentality in the nature of a perilous trap” (p. 563).
With regard to any right which the deceased boy may have had to be on the property of the defendant, the court stated that *793 it did not follow that the defendants were not liable because the boy was technically a trespasser. The court quoted from its opinion in Collentine v. City of New York (279 N. Y. 119) where at page 125 it stated: “In deciding what would be reasonable care under the circumstances, the jury were entitled to take into consideration the well-known propensities of children to climb about and play (Parnell v. Holland Furnace Co., 234 App. Div. 567; affd., 260 N. Y. 604). That rule applies even though a child might be deemed technically a trespasser (Connell v. Berland, 223 App. Div. 234; affd., 248 N. Y. 641).” The court went on to conclude that the defendants properly had been held liable for the deceased boy’s death. The court stated (307 N. Y. 565): ‘ ‘ Under these circumstances, to cover a hole, more than half as deep as the gated passageway, with flimsy ’ pieces of wood that quickly crumbled under the feet of the infant decedent, plunging him to his death in the boiler room far below, constitutes an affirmative creation of a situation pregnant with the greatest danger to life or limb, and a deceptive trap to the unwary, as perilous as an explosive bomb, highly inflammable material, a spring gun, or kindred devices. The bringing about of an inherently hazardous situation, as we had in this case, is tantamount to a reckless disregard of the safety of human life equivalent to willfulness, and an utter heedlessness of care commensurate with the risk involved, the consequences of which may well have been anticipated.” (Emphasis on the words “ highly inflammable material ” added by this court.)
In the case of Runkel v. City of New York (282 App. Div. 173, supra) the infant plaintiffs were frolicking inside a building when it collapsed. Lawsuits were commenced and the complaints dismissed after plaintiffs’ counsel opened to the jury. The Appellate Division reversed. The court pointed out that the building was decayed, rotted and in imminent danger of collapse, that this condition had existed for some time before the accident and that the condition was common knowledge chargeable to the defendants.
The court stated (282 App. Div. 176): “An abandoned open structure which is so rotted and dilapidated that it is in imminent danger of collapse may be said to constitute a trap or an 1 inherently dangerous ’ instrumentality which is in the same class as an explosive substance, inflammable material, a live electric wire or a spring gun. Injury sustained by any person, even though he be a trespasser, due to such an inherently dangerous instrumentality, may be said to have been caused by the wanton or intentional or inhuman act of the one responsible for its existence or its removal and will cast him in liability, *794 provided: (a) that care ‘commensurate with the risk involved ’ has not been taken to guard against the injury; and (b) that the accident was ‘ foreseeable ’ — as it was here because of the structure’s proximity to the public highway.” (The emphasis on the words “ inflammable material ” is added by this court.)
These two decisions then equate inflammable material or highly inflammable material with other instruments, appliances or conditions usually considered dangerous in nature. Infants, even though they are trespassers, are owed a duty by persons in control of these potentially dangerous conditions or things.
The genesis of these statements in the Runkel and Mayer cases may be found in the case of Walsh v. Fitchburg R. R. Co. (145 N. Y. 301) decided in 1895. That is the case in which, it is often stated, the doctrine of attractive nuisance was rejected as being the law of this State. The facts were that a boy five years and nine months old went upon land of the defendant. There the defendant maintained a turntable. While playing on the turntable the infant plaintiff was severely injured. The Court of Appeals reversed a judgment for him. The court pointed out (p. 307) that the turntable was on the defendant’s own land; was used solely in the proper conduct of the defendant’s business; “ was not of the nature of a trap for the unwary ”; nor was it built in an improper or negligent manner. The court then rejected the contention that the defendant was liable because it had upon its land a “ dangerous and at the same time an enticing machine, one which, when seen, would inevitably and infallibly allure children to come upon it, and that the natural and probable result of such play would be the injury of the child.” The court refused to hold that “ a person owning such a machine, although it be used on his own land, is bound to exercise extra vigilance for the purpose of preventing injury to children who come upon the defendant’s land allured by the machine and ignorant of its dangers. ’ ’ The court acknowledged that there were decisions in other jurisdictions so holding but refused to follow them. The court specifically rejected the conclusion reached by the United States Supreme Court in Railroad Co. v. Stout (17 Wall. [84 U. S.] 657), another case in which a small boy was injured while playing on a turntable. In that case the court affirmed a verdict for the plaintiff, holding that it was a question of fact for the jury whether the defendant should have anticipated that children would have played upon the turntable.
The Court of Appeals, in rejecting this rule of law which has come to be known as the doctrine of “attractive nuisance” (Prosser, Law of Torts [2d ed.], p. 439), made it clear (p. 308) *795 that an owner of land is not without some duty to persons who go upon his property. “ It is not contended for a moment that a person on his own land may under all circumstances do anything that he chooses without being held liable to answer in damages for injuries which are direct and probable and natural results of his action.”
The court then cited with approval a case in which a defendant who set a spring gun in his garden to protect his property was held liable to a plaintiff who climbed the garden wall in pursuit of a stray fowl and another case in which a plaintiff recovered from a defendant who set traps which killed the plaintiff’s dogs.
In Travell v. Bannerman (174 N. Y. 47) decided in 1903, a boy was injured when some black material exploded while two other boys were attempting to salvage pieces of brass imbedded in it. The plaintiff sought to hold the defendant liable on the ground that the defendant who owned a gun and ammunition works, had put the black material in the lot where it was found. The Court of Appeals held there was no evidence that the defendant was responsible for the black material’s being where it was found and went on to reverse a judgment for the plaintiff. Although the defendant succeeded in this case, the Court of Appeals adverted to the duty of the defendant in these words (174 N. Y. 51): “ Upon the alleged negligence of the defendant we have a much more serious question. The defendant had in his possession an explosive substance, and he was bound to the exercise of a high degree of care to so keep it as to prevent injury to others. (Shearman & Redfield on Negligence [5th ed.], sec. 689.) In the inclosed yard, where it was originally placed, it would probably have caused no accident, for it was there handled exclusively by experienced employees. In the open lot outside of the fence, where children were in the habit of playing, it was, or at last might become, a dangerous agency.” Attention has been called to this aspect of Travell v. Bannerman in subsequent opinions. (See, e.g., Morse v. Buffalo Tank Corp., 280 N. Y. 110, 116; Kingsland v. Erie County Agric. Soc., 298 N. Y. 409, 423; Hallenbeck v. Lone Star Cement Corp., 273 App. Div. 327, 331-332; Flaherty v. Metro Stations, 202 App. Div. 583, 585, and in the dissenting opinion, p. 589. Indeed two subsequent Court of Appeals opinions seem to treat this case as if the plaintiff had been successful. Perry v. Rochester Lime Co., 219 N. Y. 60, 65-66; Beickert v. G. M. Laboratories, 242 N. Y. 168, 174-175.)
The years that have elapsed since Walsh v. Fitchburg R. R. Co. (supra) and Travell v. Bannerman (supra) have seen a *796 particularization of the circumstances in which a landowner may be held liable to answer in damages for injuries which are the direct and probable results of his act. The Walsh case cited spring guns and traps for dogs baited with decaying meats, but subsequent cases have applied the principle to conditions with less of a medieval air about them, e.g., the explosion of bombs used in a fireworks display at a county fair (Kingsland v. Erie County Agric. Soc., 298 N. Y. 409, supra); high voltage electrical apparatus (French v. Central N. Y. Power Corp., 275 App. Div. 238); an opening used to raise and lower ash and rubbish cans (Mayer v. Temple Properties, 307 N. Y. 559, supra); the collapse of an abandoned and dilapidated multiple dwelling (Runkel v. City of New York, 282 App. Div. 173, supra).
After the decision in Walsh v. Fitchburg R. R. Co. (supra) but before the decisions in the Mayer and Runkel cases (supra), there were other decisions in cases where small boys sought to recover for injuries they had suffered as a consequence of inflammable substances being made accessible to them.
In 1915 in Hall v. New York Tel. Co. (214 N. Y. 49), the defendant was held not to be liable for burns suffered by a nine-year-old boy whose seven-year-old brother carried home a bottle of denatured alcohol left near the side of a road by the defendant. The brother poured some of the alcohol on the ground and put a match to it. The Court of Appeals stated (p. 52), “ that the alcohol left untouched by the boys was not of necessity dangerous. Neither was it such an apparatus or article as would induce or allure children to play with it. ’ ’
In 1922 in Flaherty v. Metro Stations (202 App. Div. 583, affd. 235 N. Y. 605) the defendant was held not liable to a nine-year-old boy who was burned after pouring on a fire gasoline which he and two other boys took from the defendant’s premises. The defendant maintained two large tanks for gasoline and oil and it was from a milk can near those tanks that the gasoline was taken. The Appellate Division refused to hold the defendant liable on the theory that the defendant’s conduct was comparable to maintaining a spring gun on its property or placing an explosive on an ash heap. In a concurring opinion it was stated (p. 588):“ Further I would not be inclined to class gasoline at the present time as a dangerous explosive (like dynamite or powder). Though somewhat volatile and highly inflammable, it has come into such common use as to be classed rather as one of the every day necessities of modern life, concerning the keeping of which no such high responsibility should be imposed.”
This very language was cited with approval by the Court of Appeals in 1939 in Morse v. Buffalo Tank Corp. (280 N. Y. 110, *797 116, supra). The court prefaced its approval of the above language with this remark of its own: ‘ ‘ While highly inflammable, the use of gasoline does not place the case at bar within the exception concerning the use of inherently dangerous materials.”
In turn, in 1949, in Kingsland v. Erie County Agric. Soc. (298 N. Y. 409, 428, supra) this language was reiterated by the Court of Appeals. Yet the same court, in 1954, stated (307 N. Y. 559, 565) that putting a frail covering over a deep hole was as perilous as “an explosive bomb, highly inflammable material, a spring gun, or kindred devices ”, and held the defendant liable. The court cited with approval Runkel v. City of New York (supra) which said much the same thing.
Since it is the most recent cases which put highly inflammable materials in the same category as spring guns, traps, live wires and explosive substances, those are the cases this court will follow. If those cases mark a widening of the duty owed to trespassing children by the possessor of inflammable materials such a development is nothing new in the law. Similar developments have occurred before and will occur again.
Accordingly the jury could have found from the testimony adduced at the trial that the defendant City of New York breached a duty it owed the injured boys when it made so accessible to them an inflammable substance and that taking into consideration 11 the well-known propensities of children to climb about and play,” care “ commensurate with the risk involved ” was not taken by the city.
With respect to whether the events that did transpire were foreseeable, almost nothing would be more alluring to nine-year-old boys than those dimly lit cavernous storerooms under the Brooklyn Bridge. It was most certainly within the jury’s province for them to hold that the city should have foreseen that boys would enter that storeroom and when there light matches.
With respect to the alleged contributory negligence of the injured boys there was nothing at all in the testimony to warrant a finding by this court that Robert Santiago was guilty of contributory negligence.
The other injured boy, Charles Carradine, maintained on his direct testimony and on his cross-examination that he lit no matches before the fire flared up and indeed did not even remember seeing a match lit by anyone immediately .before the explosion. He contended that he stood still, looked around, kept his hands in his pockets and said nothing.
*798 As noted above, Jose Argibay did testify on cross-examination that Charles Carradine lit and gave him the match which started the fire. This testimony was not given until after Jose Argibay was shown a signature which he admitted was his. The signature was on a statement which was received in evidence. Prior to this, Jose Argibay maintained on direct and cross-examination that he lit the match which set off the fire. The statement which Jose Argibay signed has been set out above but for continuity’s sake will be repeated here: “ We were playing there about ten minutes. Charles took one of the matches from the match book and lit it. He then dared me to throw the lighted match into this liquid. I took his dare and threw the lighted match into the liquid which caused flames and then an explosion took place.”
With respect to the probative value to be given this statement the jury was instructed that it could not be considered by them as affirmative evidence of the facts recited in the statement but could only be used to impeach or correct testimony given by Jose Argibay (Matter of Roge v. Valentine, 280 N. Y. 268, 276).
Opposed to Charles Carradine’s steadfast contention that he lit no match while in the storeroom, the jury had before it the testimony of Jose Argibay who told one story on direct examination and continued to tell the same story on cross-examination until he was confronted with a statement he had made to the city. Under these circumstances, even if it be assumed that Charles Carradine would have been guilty of contributory negligence if he had lit the match, the question of who lit the match was one of fact for the jury to resolve.
In conclusion then, all the motions made by the city are denied.